# United States District Court

__MIDDLE__ DISTRICT OF __ALABAMA__

**In the matter of the Search of**

(Name, address or brief description of person, property or premises to be searched)

214 N. Ashurst Street
Tallassee, Alabama 36078

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 2:06mj 128-CSC

I, __Doug Walters__ being duly sworn depose and say:

I am a(n) __Task Force Agent__ and have reason to believe that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
   214 N. Ashurst Street, Tallassee, Alabama, and any vehicles and out buildings and other places within the curtilage of said property 214 N. Ashurst Street, Tallassee, Alabama

in the __Middle__ District of __Alabama__

there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE AFFIDAVIT

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**Attachment A**

concerning violations of Title __21, United States Code, Sections 841(a)(1)__ .

The facts to support the issuance of a Search Warrant are as follows:

**SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

Novmeber 7, 2006                                   at   Montgomery, Alabama
Date                                                      City and State

Charles S. Coody, U.S. Magistrate Judge            _____
Name and Title of Judicial Officer                 Signature of Judicial Officer

## AFFIDAVIT

I, H. Doug Walters, Task Force Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) being duly sworn, depose and state as follows:

1. Your affiant is a Task Force Agent with the Drug Enforcement Administration (DEA). I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am currently employed with the Tallassee, AL Police Department and have been so employed for nine and one half (9 ½) years. I am currently assigned to the United States Drug Enforcement Administration (DEA), and have been so assigned for the past ten months. I am currently assigned to the New Orleans Division of the Drug Enforcement Administration, the Montgomery District Office. I have investigated criminal violations of the Federal controlled substance laws, including, but not limited to, investigations involving smuggling of controlled substances, distribution of controlled substances in violation of Title 21, United States Code, Section 841; and laundering of the proceeds derived from the sale of controlled substances in violation of Title 18, United States code 1956 and 1957.

3. Based on information recently received and the investigation that has developed, certain facts have emerged that make it necessary for a search warrant to be sought, thus prompting this affidavit. The testimony contained in this affidavit is based on my personal knowledge, knowledge of other law enforcement officers, and

confidential sources. Based on the facts and information contained in this affidavit, your affiant has probable cause to believe that crack cocaine ,drug paraphernalia, illegal drug proceeds, and documents indicative of Cedrick BROWN narcotics distribution network, are being kept, stored, and concealed at 214 N. Ashurst Street Tallassee, AL 36078. The residence is described as a single story gray house.

4. On August 31, 2006 a confidential source was met by Agents from the DEA Montgomery District Office at a predetermined location. The purpose for this meeting was to make a phone call to Cedrick BROWN to meet with BROWN to discuss future purchases of crack cocaine. During this meeting BROWN produced a Glock .40 caliber pistol from his waistband and showed it to the confidential source.

5. On October 31, 2006 a confidential source was met by Agents from the DEA Montgomery District Office at a predetermined location. The purpose for this meeting was to make a phone call to Cedrick BROWN and set up the purchase of two(2) and one quarter(1/4) ounces of crack cocaine. The confidential source was searched, along with the confidential source's vehicle for any illegal contraband. No contraband was located by Agents. After the search, the confidential source placed a phone call to BROWN, which was recorded. During the phone call, BROWN instructed the confidential source to meet him at Tiger Car Wash & Detail, which BROWN owns.

6. BROWN arrived at the car wash driving a white Chevrolet Lumina bearing Alabama registration CR0037. The vehicle is registered to Cedrick BROWN and registration shows the address 214 N. Ashurst Street Tallassee, AL 36078. The vehicle was also occupied by black male LaMario HARRIS.

7. The confidential source entered the vehicle with BROWN and HARRIS.

BROWN told the confidential source that he only had two ounces of crack cocaine. The confidential source told BROWN that would be fine. BROWN instructed the confidential source to give him a few minutes to travel and get the crack cocaine because he did not have it on him. The confidential source exited the vehicle and BROWN drove off.

8. BROWN was under surveillance after he drove off from the confidential source. BROWN was observed driving the white Chevrolet Lumina to his residence at 214 N. Ashurst Street Tallassee, AL 36078. Agents observed HARRIS exit the vehicle and walk towards the residence. HARRIS was then observed walking towards the rear of the yard. Initially surveillance was not able to see where BROWN went due to trees. Upon review of the surveillance video tapes taken by air surveillance your affiant has been able to determine that BROWN AND HARRIS exited the side of the residence at 214 N. Ashurst Street, Tallassee, AL 36078, after HARRIS was observed walking towards the rear of the yard. This view was available after the surveillance aircraft had flown to a different location. Surveillance then observed the white Chevrolet Lumina leaving the residence with BROWN AND HARRIS inside the vehicle. BROWN and HARRIS then went directly back to meet the confidential source without anymore stops.

9. Once back at the car wash the confidential source entered the vehicle again. During the transaction, BROWN told the confidential source that he did not have his scales, but could get them if needed. The confidential source told BROWN if it was not correct he would call him. The confidential source gave HARRIS $1,700 in serialized "buy" money in exchange for the suspect crack cocaine. The confidential source exited the vehicle with the suspected crack cocaine and left the car wash. The confidential source met back with Agents and the crack cocaine was turned over to me. The

suspected crack cocaine was then field tested with positive results for cocaine.

10.    After the transaction Agents continued surveillance on BROWN and HARRIS. BROWN and HARRIS met with another vehicle behind the car wash across the street from BROWN'S car wash. After what appeared to be another drug transaction with the other vehicle, BROWN and HARRIS drove around the block and went back to 214 N. Ashurst Street Tallassee, AL 36078.

11.    Both BROWN and HARRIS have prior drug convictions. BROWN was convicted on 03/01/01 for Possession with Intent to Distribute Cocaine and Cocaine Base and is currently on supervised release. HARRIS plead guilty on June 19, 2006 in Elmore County for three counts of Unlawful Distribution of Controlled Substance.

12.    On November 04, 2006 a confidential source was at the Victory Land Dog Track and BROWN approached the confidential source. BROWN told the confidential source that BROWN was going to Atlanta, GA and pick up one(1) and one half (1/2) kilogram of cocaine on November 04, 2006 or November 05, 2006. Also during this conversation BROWN produced a large roll of one hundred dollar (100) bills from his pants pocket.

13.    On November 05, 2006 BROWN called the confidential source on the telephone and BROWN stated he was back from Atlanta. After the phone call, BROWN arrived at the Victory Land Dog Track and approached the confidential source. During this conversation, BROWN told the confidential source that BROWN paid twenty eight thousand and five hundred dollars ($ 28,500.00) for the one (1) and one half (1/2) kilogram of cocaine. The confidential source asked BROWN what would the price be for four (4) ounces of crack cocaine and BROWN stated four thousand dollars ($4, 000.00).

14. The confidential source has proven to be reliable. During the past year the confidential informant has supplied information on drug traffickers and the information has been corroborated by Agents. Also during the past year, the confidential source has made approximately nine (9) controlled purchases in three(3) separate investigations, including the purchase from BROWN and HARRIS on October 31, 2006.

Based on my training experience, previously recited, and my participation in numerous investigations involving narcotics importation and distribution organizations and in financial investigations involving large amounts of controlled substances, currency and other monetary instruments, I am aware of the following;

    a. that large-scale narcotics traffickers commonly maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing narcotics business;

    b. that individuals engaged in narcotics trafficking and/or money laundering commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other paper relating to the illegal distribution of controlled substances; that these same individuals commonly "front" (provide on consignment) narcotics to their clients; that the aforementioned books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are maintained where the narcotics traffickers have ready access to them;

    c. narcotics traffickers and those engaged in the laundering of money commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the trafficking organization;

      d.    that, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences and businesses of narcotics traffickers;

      e.    that it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letter of credit, money orders, bank drafts, cashiers checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

      f.    that large scale narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described above

      g.    that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

      h.    that narcotics traffickers at times become fearful that their

extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

      i.      Drug traffickers commonly maintain in their wallet, purse or pockets, telephone numbers of drug associates, safe deposit box keys, cash receipts of expenditures or other documents such as business cards, providing leads to the disposition of drug proceeds. Therefore, it is requested that all aforementioned persons be searched for evidence of drug trafficking.

      j.      Drug traffickers are also known to use their vehicles to transport drugs, store drug proceeds and store records relating to their drug activities, such as gasoline tickets revealing out of town trips. Therefore, it is requested that all vehicles on the aforementioned premises be searched for evidence of drug trafficking.

      k.      That as an experienced agent, your affiant states that controlled substances can be sold in various quantities which could be small in size. Your affidavit states that because these items are very small, they can easily be hidden on one's person, on one's residence in closed or locked containers, such as file cabinets, safes, vaults, drawers, luggage, briefcases, valises, boxes, cans, bags, purses, and any other closed or locked hiding places. Drug dealers conceal their narcotics in these places as previously described in order to prevent drug "rip-offs" by drug dealers and users and in

order to avoid detection and seizure by law enforcement officers.

l.  That it has been your affiant's experience that such items as utility bills, and/or rent receipts are essential in the investigation of narcotics violations in that they tend to establish control of the residence.

m.  That it has also been your affiant's experience that persons who deal in controlled substances will quite often "front" drugs to buyers and keep records of these in order to keep track of who owes what. These records are commonly referred to as "totes" or "ledgers" and will quite often be found in one's residence and on one's person. Records of this nature are important to the investigation in that they tend to show the intent of the person in possession of these drugs.

n.  That it has been your affiant's experience in searching numerous residences for drug violations that it is not uncommon to find such items as scales and/or plastic baggies and/or cigarette rolling papers or other drug paraphernalia, and that these items are essential in the investigations of drug violations in that they tend to establish the intent of possession for sale.

o.  That it has also been your affiant's experience that drug manufacturers and traffickers commonly have in their possession, that is on their person, at their residence, and/or their businesses, firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure drug trafficker's property or enterprise.

p.  That it has also been your affiant's experience during numerous searches of residences and persons trafficking in controlled substances, that your

affiant and other law enforcement agents have on numerous occasions found photographs and videotapes of the residents of said properties and their associates who were involved with them in criminal activities. Drug traffickers frequently take or cause to be taken photographs or videotapes of themselves, their associates, their property, and their product and that these traffickers usually maintain these photos and tapes in their possession.

    q.    That it has also been your affiant's experience that drug traffickers often purchase and/or title assets in fictitious names, aliases, or in the names of their relatives, associates or business entities, to avoid detection and seizure of these assets by government agencies. Also, that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

    r.    That it has also been your affiant's experience that it is common for drug traffickers to use cellular telephones because they are portable and often more difficult to investigate.

    14.    Based on the foregoing facts and information, I have probable cause to believe that cocaine, illegal drug proceeds, firearms, and serialized "buy money" are being kept, stored, and concealed at 214 N. Ashurst Street, Tallassee, Alabama. Moreover, based on your affiant's knowledge and experience, narcotics, narcotic related paraphernalia and drug proceeds are mobile and can be moved from place to place quickly for concealment. Therefore, this information supports the search of vehicles and out buildings and other places within the curtilage of said property where narcotic substances can be hidden.

**Doug Walters, Affiant**
**DEA Task Force Agent**

Sworn to and subscribed before me,
this _____, day of November, 2006

**CHARLES S. COODY**
**United States Magistrate Judge**

10

## ATTACHMENT A

<u>Property to be Seized</u>

1. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

2. Papers, tickets, notes, schedules, receipts and other items relating to domestic and interstate travel.

3. Books, records, receipts, bank statements, and records, money drafts, letter of credit, money orders and cashier's checks, receipts, pass books, bank checks, safety deposit box keys, and other items evidencing the obtaining, secreting, transferring, and/or concealing of assets and the obtaining, secreting, transferring, concealing, and/or expending of money.

4. United States currency, precious metals, jewelry and financial instruments, including stocks and bonds in amounts indicative of the proceeds of illegal narcotics trafficking.

5. Photographs, video tapes in particular, photographs of co-conspirators, of assets and/or of controlled substances, in particular, crack cocaine.

6. Receipts for items evidencing the expenditure of the proceeds of drug distribution, including, but not limited to, clothing, furniture and electronic equipment.

7. Paraphernalia for packaging, cutting, weighing, converting and distributing controlled substances, including, but not limited to, scales, baggier, spoons, walkie-talkies, CB's, night-vision devices, two-way radios, police scanners, cellular phones, and beepers.

8. Indicia of occupancy, residency, and/or ownership of the premises, including, but not limited to, utility and telephone bills, canceled envelopes, keys.

9. Firearms and any controlled substances.

2

10. Cellular telephones, to include the contents of any cellular telephone, such as electronic information containing numbers recently dialed, recently received telephone call numbers, electronic telephone listings or directories, and voice mail messages.